**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

FILED
MAR 3 1 2008
NANCY MAYER WHITTINGTON, CLERK
U S DISTRICT COURT

| | |
|---|---|
| **FILEBARK, et al.,** )  | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| v. ) | Civil Case No. 03-1685 (RJL) |
| ) | |
| **U.S. DEPARTMENT OF** ) | |
| **TRANSPORTATION, et al.** ) | |
| ) | |
| **Defendants.** ) | |

st

**MEMORANDUM OPINION**
(March 31, 2008) [# 71, #74, #75]

Jerry Todd ("Todd") and Richard S. Boatman ("Boatman") ("plaintiffs"), Air Traffic Control Supervisors at the Albuquerque, New Mexico Air Traffic Control Center ("Albuquerque Center" or "Center"), brought this action against the Federal Aviation Administration ("FAA") and the United States Department of Transportation ("DOT") ("defendants") seeking, in essence, a reversal of the FAA's decision regarding the air traffic control classification of the Albuquerque Center. On February 23, 2006, the Court granted in part and denied in part defendants' motion to dismiss.[1] Both parties filed motions for reconsideration, which the Court denied via separate Minute Orders on December 19, 2006. Now before the Court are Defendants' Motion to Dismiss, or

---

[1] In its February 23, 2006 Memorandum Opinion, the Court dismissed plaintiffs Joseph J. Filebark II and John J. Havens II but permitted the suit by plaintiff Todd to go forward on the grounds that defendants had not demonstrated on the record then before the Court that Todd had failed to exhaust his administrative remedies. *Filebark v. U.S. Dep't of Transp.*, 468 F. Supp. 2d 3, 7 (D.D.C. 2006). The remaining plaintiffs are Todd and Boatman. The Court granted Boatman's motion to intervene on December 19, 2006 via Minute Order.

Alternatively, for Summary Judgment (Dkt. #71) ("Defs. Mot."); Plaintiffs' Cross-Motion for Summary Judgment and Opposition to Defendants' Motion to Dismiss or for Summary Judgment (Dkt. #74) ("Pls. Cross-Mot."); and Plaintiffs' Motion to Include Additional Materials (Dkt. #75). Upon consideration of the briefs, the relevant law and the entire record herein, the Court GRANTS defendants' motion to dismiss and DENIES plaintiffs' cross-motion for summary judgment.[2]

## BACKGROUND[3]

Pursuant to the Administrative Procedures Act ("APA"), plaintiffs seek judicial review of the FAA's decisions to deny the Albuquerque Center's requests to upgrade its classification from an air traffic control ("ATC") Level 10 to an ATC Level 11. Ultimately, plaintiffs want the FAA to pay them the higher salary associated with working at an air traffic control center classified as an ATC Level 11. For the following reasons, the Court will not reverse the FAA's classification decision.

*A.   General Background*

The Department of Transportation Appropriations Act of 1996, Pub. L. No. 104-50, § 347, 109 Stat. 436 (1995), as amended by Pub. L. No. 104-122, § 1, 110 Stat. 876 (1996) ("DOT Act")[4] directed the FAA Administrator to develop and implement a new personnel management system, which would put into effect a new compensation and

---

[2] In light of the Court's determination that is lacks jurisdiction, it DENIES as moot Plaintiffs' Motion to Include Additional Materials.

[3] The parties agree that the material facts are undisputed, but that the legal significance of those facts remains disputed.

[4] For ease of reference, the Court will use the term "DOT Act" to refer to not only the statute cited above, but also to any subsequent amendments, which have collectively been codified at 49 U.S.C. § 40122.

2

classification system that would classify FAA facilities and determine the pay of the FAA workers at those facilities. *Filebark v. U.S. Dep't of Transp.*, 468 F. Supp. 2d 3, 4 n.2 (D.D.C. 2006) (Leon, J.) (citing 49 U.S.C. § 40122(g)). Congress directed that the "new system shall, at a minimum, provide for greater flexibility in the hiring, training, compensation, and location of personnel." 49 U.S.C. § 40122(g)(1). Pursuant to this authorization, the FAA implemented the FAA Personnel Management System ("PMS") in March 1996. (*See generally* A.R. 2-31.) The PMS anticipated that the FAA and the National Air Traffic Controller Association ("NATCA") would continue working together to devise a compensation plan "that values job complexity and compensates the employees based on level of work performance." (A.R. 14.)

In July 1998, the FAA and NATCA reached an agreement on the new compensation system.[5] (A.R. 133.) This system would transition the FAA from the GS system to the air traffic control ("ATC") system: the Position Classification Standard for Air Traffic Control Series ATC – 2152 Terminal and En Route ("PCS").[6] (A.R. 136-204.) The PCS categorizes facilities based on traffic count, with classification levels ("ATC Level") ranging from ATC Level 3-12. (A.R. 313.) The FAA then compensates employees according to the ATC Level assigned to the facility at which they are employed. ATC Levels are assigned using a Classification Index ("CI"), which is

---

[5] Although the pay agreements between the FAA and NATCA do not encompass supervisors, such as plaintiffs here, the FAA notified its employees that it had decided to extend the agreements with the NATCA to supervisory employees. (A.R. 32-33.)

[6] The parties dispute whether the July 1998 PCS or the January 1999 PCS (A.R. 136-204) constitutes a final version of the compensation plan. The dispute is only relevant for determining whether the appropriate break point between a Level 10 facility and a Level 11 facility is 1200 or 1250. Since the Court does not have jurisdiction to reach the merits, resolution of this dispute is unnecessary.

calculated based on various factors, including traffic volume. *See Todd v. United States*, 56 Fed. Cl. 449, 450 (Fed. Cl. 2003), *aff'd* 386 F.3d 1091 (Fed. Cir. 2004); *see also* A.R. 313. The methodology for computing the CI is set forth in the PCS. (A.R. 180-81.) The FAA uses a software program, called Enroute Track Analysis Program or ETAP, to calculate traffic counts used to generate the CI. *See Todd*, 56 Fed. Cl. at 450-51. The CI required for a particular ATC Level is based on "break points" established by the FAA and NATCA.[7]

Recognizing that a facility's air traffic count might change over time, the PCS provides general guidelines for a facility to request an ATC Level upgrade. (*See* A.R. 193.) The FAA and NATCA refined the procedures for obtaining a facility upgrade in a November 15, 1999 Memorandum of Understanding with Respect to Reclassification and Associated Pay Rules Between the National Air Traffic Controllers Association and the Federal Aviation Administration ("November 1999 MOU"). (A.R. 205-08.) The November 1999 MOU delineates seven requirements a facility must meet to obtain an

---

[7] Despite reaching an agreement, the parties acknowledged that further work was required to implement the PCS. They memorialized their intent to continue working in a July 8, 1998 Memorandum of Understanding with Respect to Reclassification and Associated Pay Rules ("July 1998 MOU") and a July 9, 1998 Principal Memorandum of Agreement Between the National Air Traffic Controllers Association and the Federal Aviation Administration ("July 1998 MOA"). (*See generally* A.R. 311-27; *see* A.R. 316, 325 ("The parties have made a good faith effort to devise a new pay system consistent with the agreement on additional funds to be made available in each of the first three fiscal years of the life of the new collective bargaining agreement. The parties recognize, however, that certain variables are sufficiently complex that the fiscal year mark will likely not be met precisely.").) Although the FAA transitioned to the ATC pay system in October 1998, the FAA/NATCA Reclassification Team ("Reclassification Team") continued to work on the new classification system. Updates provided by the Reclassification Team noted that the classification process was ongoing, and due to additional data collection, the previously-distributed facility grades might change. (A.R. 133.) To mitigate any impact, they noted that the break points might need to be adjusted. (A.R. 134.)

upgrade, including providing the facility's traffic count and CI calculation. (A.R. 206.) The final requirement is that "[t]he data will be validated at the Regional and/or National Level." (*Id.*)

If an employee or facility wishes to challenge a classification decision, the PCS delineates an Appeal Process to seek review of "[t]he way in which the classification standard is interpreted or applied at a specific facility." (A.R. 194). Pursuant to the Appeal Process, an individual employee may initiate an appeal, but only the Facility Manager and the NATCA Facility Representative are authorized to file the appeal. (*Id.*) Upon receipt of an appeal, a Classification Appeal Review Committee ("CARC"), consisting of a NATCA representative and an Air Traffic Management Representative, will be established; it will issue a written statement of findings within sixty days. (*Id.*) This decision is final and binding; no further appeal is permitted. (A.R. 195.) To the extent the CARC cannot reach a mutual decision, an appeal may be taken to the Classification Appeals Board ("CAB"). (*Id.*)

  B. *Albuquerque Center's Upgrade Requests*

The FAA originally assigned the Albuquerque Center an ATC Level 10. The Albuquerque Center, however, has repeatedly requested an upgrade to an ATC Level 11. The Center's air traffic manager, Joan Mallen, initiated the Center's first upgrade request on June 7, 2000.[8] (A.R. 302-04.) Although the request acknowledged that the Center's

---

[8] Plaintiffs' Amended Complaint and Cross-Motion assert that since the Albuquerque Center's initial classification, the FAA has erroneously classified the Center as an ATC Level 10. This assertion is based, in part, on their contention that the FAA applied an incorrect break point and that ETAP did not count certain special use airspace traffic, such as military traffic. (*See, e.g.*,

current CI was below the Level 11 break point, it attributed that to the erroneous exclusion of some Special Use Airspace traffic, such as military operations. (A.R. 302.) On September 6, the air traffic manager sent a complete application for an upgrade, which also requested "assistance in validating this data" pursuant to the terms of the November 1999 MOU. (A.R. 306-08, 308.)

The FAA denied Albuquerque Center's request on October 17, 2000. (A.R. 209.) It noted that until it completed the validation of ETAP, it would not run a CI for classification purposes. (*Id.*) The FAA also pointed out that the current year of traffic data on file indicated that the Center had not met the requirements for an upgrade. (*Id.*) The Albuquerque Center was encouraged to submit a new upgrade request once the ETAP validation was complete and it met the upgrade requirements. (*Id.*)

Subsequently, Todd, in his capacity as an Air Traffic Control Supervisor, sought to initiate an appeal of the FAA's decision. The Albuquerque Center's Facility Manager, Joan Mallen, declined to file the appeal. (Pls. Opp'n to Mot. to Dismiss [Dkt. #27], Ex. 13, ¶ 11.) Undeterred, Todd also tried to lodge a complaint with the Merit Systems Protection Board ("MSPB"), but they declined to accept the grievance. (*Id.* ¶ 13.)

In 2001, however, the Albuquerque Center requested another upgrade. As part of this request, the National Validation Team ("NVT") conducted an audit of the Center in

---

Pls. Cross-Mot. 8 & n.5; Am. Compl. ¶ 22.) Although plaintiffs argue that the initial classification was incorrect, they do not challenge any agency decision relating to this determination.

July 2001.[9] (A.R. 265-300.) The NVT determined that "the facility has experienced adaptation problems between the HOST computer and ETAP that had an impact on the facilities (sic) classification index." (A.R. 265.) Once the adaptation problems were corrected during the validation process, the Center's CI was below the required breakpoint. (*Id.*) As a result, the Albuquerque Center's upgrade request was denied on September 26, 2001. (*Id.*)

In the interim, plaintiff Todd had filed a contract claim in the Court of Federal Claims in July 2001, seeking back pay on the grounds that the FAA's refusal to upgrade the Albuquerque Center's ATC Level violated the collective bargaining agreement between the FAA and the NATCA. *See generally Todd v. United States*, 56 Fed. Cl. 449 (Fed. Cl. 2003), *aff'd*, 386 F.3d 1091 (Fed. Cir. 2004). The Federal Circuit upheld the dismissal of that case on October 5, 2004. *See Todd v. United States*, 386 F.3d 1091 (Fed. Cir. 2004). Shortly thereafter, on December 22, 2004, plaintiffs sought leave to file an Amended Complaint adding Todd as a plaintiff to this action, but still seeking judicial review of the FAA's classification upgrade decisions.

## DISCUSSION

### I.   Standard of Review

Federal Rule of Civil Procedure 12(b)(1) provides for dismissal of a complaint for lack of subject matter jurisdiction. Under Rule 12(b)(1), "the plaintiff bears the burden of establishing the factual predicates of jurisdiction by a preponderance of the evidence."

---

[9] Plaintiffs assert that the version of ETAP in use during the summer of 2001 still did not count military traffic and also did not calculate the CI based on the appropriate number of hours, in violation of the PCS requirements for calculating a facility's CI.

*Lindsey v. United States*, 448 F. Supp. 2d 37, 42 (D.D.C. 2006) (quoting *Erby v. United States*, 424 F. Supp. 2d 180, 182 (D.D.C. 2006)). "The [C]ourt, in turn, has an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority." *Id.* at 42-43 (alteration in original) (quoting *Abu Ali v. Gonzales*, 387 F. Supp. 2d 16, 17 (D.D.C. 2005)).

## II. The Department of Transportation Appropriations Act of 1996 Precludes Judicial Review of the FAA's Facility Classification

The FAA challenges the Court's jurisdiction on the grounds that judicial review of plaintiffs' APA claims is precluded by the DOT Act.[10] Plaintiffs assert that their claims

---

[10] Plaintiffs claim that the law of the case doctrine bars the FAA from asserting its jurisdictional arguments because the Court's denial of the FAA's original motion to dismiss and motion to alter or amend judgment implicitly rejected those arguments. (*See* Pls. Cross-Mot. 23-26.) I disagree. The law of the case doctrine embodies "the general concept that a court involved in later phases of a lawsuit should not re-open questions decided (i.e., established as the law of the case) by that court or a higher one in earlier phases." *Crocker v. Piedmont Aviation*, 49 F.3d 735, 739 (D.C. Cir. 1995). The doctrine is prudential, not jurisdictional. *See id.* at 739-40. This applies to issues decided explicitly or by necessary implication. *See LaShawn A. v. Berry*, 87 F.3d 1389, 1394 (D.C. Cir. 1996) (*en banc*). Although our Circuit Court has rejected a subject matter jurisdiction exception to the doctrine, it also recognizes that it is a prudential doctrine. *See id.* at 1393-94. If the initial decision was "clearly erroneous and would work a manifest injustice," reconsideration is permissible. *See id.* at 1383 (citations and internal quotations omitted). In its prior Memorandum Opinion, the Court explicitly stated its understanding that defendants were moving to dismiss plaintiff Todd's claim "because he failed to exhaust his administrative remedies and because he already brought an action in the Court of Federal Claims regarding the same issue." *Filebark v. U.S. Dep't of Transp.*, 468 F. Supp. 2d 3, 7 (D.D.C. 2006). It did not believe that defendants' § 701(a) arguments were made as to plaintiff Todd. Additionally, the pleadings with regard to Defendants' Motion to Alter or Amend Judgment purported to argue that the court lacked jurisdiction over classification decisions because they were committed to agency discretion. Although both parties sprinkled variations of the word "preclude" into their briefing on the Motion to Alter or Amend Judgment, it was far from apparent to the Court that they were making arguments as to whether the Court lacked jurisdiction because a statute precluded judicial review pursuant to § 701(a)(1), as opposed to because the matter was committed to agency discretion pursuant to § 701(a)(2). Any confusion stemmed from the parties' lack of clarity regarding their arguments. Now that it is clear that defendants argue the Court lacks jurisdiction pursuant to § 701(a)(1), as well as § 701(a)(2), it is apparent that failing to consider this argument would, for the reasons *infra*, be erroneous and

are properly brought pursuant to the APA since the upgrade decisions constitute a final agency action for which there is no other remedy in court.[11] (Pls. Opp'n to Mot. to Dismiss [Dkt. #27] 12 (citing 5 U.S.C. § 704).) They contend that the case law regarding the preclusive effect of the Civil Service Reform Act ("CSRA") is irrelevant because the FAA is exempt from that statute, and the PMS does not provide comparable recourse. (*Id.* at 10-11.) The FAA, on the other hand, argues that the PMS provides the exclusive remedies for challenging FAA personnel actions. It supports its argument by comparing the PMS, which it implemented pursuant to § 347 of the DOT Act, to the CSRA, which courts have routinely held to preclude judicial review. (Defs. Mot. 16-22.) For the following reasons, I agree with the defendants.

The APA "embodies the basic presumption of judicial review." *Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967). Specifically, "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704. The APA limits review, however, where "statutes preclude judicial review" or where "agency action is committed to agency discretion by law." *Id.* § 701(a)(1), (2). Absent an express statutory prohibition of judicial review, courts require a showing of "clear and convincing" legislative intent to preclude judicial review. *See Abbott Labs.*, 387 U.S. at 141. "Whether and to what extent a particular statute precludes judicial review is determined not only from its

---

work a manifest injustice. Thus, addressing this argument is not inconsistent with the law of the case doctrine.

[11] In support of their contention that the challenged agency actions are subject to judicial review, plaintiffs rely exclusively on their papers filed in conjunction with the prior motion to dismiss and motion for reconsideration. (Pls. Cross-Mot. 25-26.)

express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Block v. Comty. Nutrition Inst.*, 467 U.S. 340, 345 (1984); *see also United States v. Fausto*, 484 U.S. 439, 443-44 (1988) ("examining the purpose of the [statute], the entirety of its text, and the structure of review that it establishes" to determine whether it precludes judicial review). An analysis of the DOT Act and the subsequent PMS and PCS illustrate Congress' clear intent to limit judicial review of FAA personnel decisions to what is explicitly provided.

Congress enacted the DOT Act "to give the FAA the opportunity to replace standing regulations with its own specific personnel management system" that would address the "unique demands" of the FAA's workforce. *See Fed. Air Marshals v. United States*, 74 Fed. Cl. 484, 487 (Fed. Cl. 2006). To permit the FAA to create its own personnel management system that would "provide for greater flexibility in the hiring, training, compensation, and location of personnel," the DOT Act exempted the FAA from most federal personnel laws, including many provisions of the Civil Service Reform Act. *See* 49 U.S.C. § 40122(g)(1); *see also* H.R. Rep. No. 104-475(I) (1996), *available at* 1996 WL 108579, *31 (DOT Act "deal[s] with these problems by giving the agency the flexibility to develop its own procurement and personnel systems best suited to its unique mission. . . . by exempting the agency from current . . . personnel laws that hinder its flexibility"). The Civil Service Reform Act, Pub. L. No. 95-454, 92 Stat. 111 (codified, as amended, in scattered sections of 5 U.S.C.) ("CSRA"), is "an integrated scheme of administrative and judicial review, designed to balance the legitimate interests of the various categories of federal employees with the needs of sound and efficient

administration." *Fausto*, 484 U.S. at 445. Despite the FAA's general exemption from the CSRA and other federal personnel laws, Congress specifically maintained the applicability of certain "existing laws on whistle-blower protection, prohibiting strikes, prohibiting discrimination and those laws relating to suitability, security, conduct, workmen's compensation, unemployment compensation, retirement, labor-management relations, life insurance, and health insurance." H.R. Rep. No. 104-475(I), *available at* 1996 WL 108579 at *40. In fact, Congress amended the statute in 2000 to give FAA employees the right to petition the Merit Systems Protection Board in connection with major adverse personnel actions related to whistleblowing. *See* Wendell H. Ford Aviation Investment and Reform Act for the 21st Century, Pub. L. No. 106-181, § 308, 114 Stat. 61 (2000).

Exercising the discretion afforded it by Congress, the FAA implemented the PMS, which, along with the DOT Act, governs FAA personnel. In doing so, it chose to make additional federal personnel laws applicable to the FAA, (A.R. 3 (exercising discretion to have certain sections of Title 5 applicable to FAA)), and it established its own grievance and appeal procedures,[12] (A.R. 22-26). Moreover, when the FAA implemented the PCS pursuant to the PMS, it instituted an Appeal Process for facility classification decisions. (A.R. 194-95.) Those procedures, however, do not provide judicial review for agency decisions regarding facility upgrade requests.

---

[12] The PMS also provides additional procedural protections akin to protections provided for by the CSRA. For example, both the PMS and CSRA guarantee employees written notice of adverse personnel actions, such as removal, with an opportunity to respond. *Compare* A.R. 20-22 (FAA PMS Ch. III, ¶ (g)-(q)), *with* 5 U.S.C. § 4303(b).

Indeed, allowing plaintiffs' claims to proceed here would undermine Congress' clear intent to the contrary. Congress exempted the FAA from the CSRA to give the FAA as much flexibility as possible in developing its own personnel management system. Permitting judicial review of personnel decisions that neither Congress, nor the FAA, elected to subject to judicial review would thwart that flexibility. Not surprisingly, the Fifth Circuit reached a similar conclusion in *McAuliffe v. Rice*, 966 F.2d 979 (5th Cir. 1992).

In *McAuliffe*, the Fifth Circuit faced an APA claim by an employee of a non-appropriated funded instrumentality ("NAFI"), run by the Air Force, challenging her termination. Congress had exempted NAFIs from the CSRA to provide them with program flexibility. *See id.* at 979. In holding that the action was precluded, the Fifth Circuit explained that since Congress "deliberately exempted NAFI employee" from the CSRA to give them "the maximum possible personnel flexibility," requiring judicial review of those decisions "thwarts the goal of maintaining flexibility." *See id.* at 980-81.

Moreover, the comprehensive personnel system established by the DOT Act and the PMS supports the finding that judicial review is precluded here. Courts have recognized that the comprehensiveness of the CSRA demonstrates Congress' intent for the CSRA to provide the exclusive remedies for agency personnel actions. Accordingly, absent a provision for judicial review in the CSRA, challenges to agency personnel actions cannot be pursued via other statutes, like the APA. *See Fausto*, 484 U.S. at 455 (holding that Congress' establishment of a "comprehensive system for reviewing personnel action" judicial review if the statute excludes an employee from those

provisions); *see also Graham v. Dep't of Justice*, No. 02-1231, 2002 WL 32511002, *2 (D.D.C. Nov. 20, 2002) ("The law is well-settled that the CSRA displaces all other bases for judicial review of personnel actions taken against federal employees, including the APA."), *aff'd Graham v. Ashcroft*, 358 F.3d 931 (D.C. Cir. 2004); *Forrey v. Office of Pers. Mgmt.*, 70 F.3d 1271, *1 (6th Cir. 1995) (unpublished table) (upholding determination that Congress did not intend that judicial review be available pursuant to the APA after enactment of the CSRA because "the [FAA's] classification decision [of an employee's position based on the density of air traffic handled in the Cleveland region] was discretionary and therefore not subject to judicial review").

It has also been observed by various courts that the principles regarding the CSRA's exclusivity in providing remedies "appl[y] even where the federal employee in question is not covered by the CSRA at all," as is the case with the plaintiffs here. *See Graham*, 2002 WL 32511002 at *3, n.1 (citing *McAuliffe v. Rice*, 966 F.2d 979 (5th Cir. 1992)); *see also Croddy v. FBI*, No. 00-0651, 2006 WL 2844261 (D.D.C. Sept. 29, 2006) (holding that the CSRA precluded judicial review of FBI personnel actions within the ambit of the CSRA even though FBI is exempt from CSRA). The DOT Act was intended to supplant the CSRA and permit the creation of a personnel management system specifically designed for and by the FAA. Where Congress wanted to guarantee certain remedies, it explicitly did so. Thus, by providing the FAA with the discretion and flexibility to create its own personnel management system, Congress intended that resulting system to constitute the entire personnel system.

That the statutory scheme specifically provides for judicial review of certain other limited agency actions also suggests Congress' intent to preclude judicial review here. For example, Congress specified in the statute that employees have the ability to ultimately seek judicial review of an adverse ruling regarding a "major adverse personnel action." *See* 42 U.S.C. § 40122(h) (permitting review of "major adverse personnel action" through the FAA's Guaranteed Fair Treatment procedures); A.R. 24-26 (FAA Guaranteed Fair Treatment procedures ultimately permit an employee to seek judicial review). These "major adverse personnel actions" include "a suspension of more than 14 days, a reduction in pay or grade, a removal for conduct or performance, a nondisciplinary removal, a furlough of 30 days or less . . . or a reduction in force action." 42 U.S.C. § 40122(j). Similarly, the DOT Act also provides for judicial review of certain challenges to "prohibited personnel practices" under "section 2302(b), relating to whistleblower protection." 49 U.S.C. § 40122(g)(2)(A). By contrast, neither the DOT Act nor the PMS provide the same review process to employees challenging "classification decisions." Indeed, the parties do not dispute this, and to the extent an upgrade classification decision could be considered in theory a "prohibited personnel practice" under the CSRA (*i.e.*, denying an employee equal pay for equal work), Congress did not provide for the possibility of judicial review for "prohibited personnel practices" in general, only prohibited personnel actions relating to whistleblowers. 49 U.S.C. § 40122(g)(2)(A). Thus, Congress left to the discretion of the FAA how to review erroneous classification decisions. And the FAA decided to limit the process to the Appeal Process set forth in the PCS, which does not contemplate judicial review. (A.R.

194-95.) Thus, for this Court to allow plaintiffs to proceed with judicial review here would "turn the review structure of the [DOT Act] on its head."[13] *See Ryon v. O'Neill*, 894 F.2d 199, 203 (6th Cir. 1990); *see also McAuliffe v. Rice*, 966 F.2d 979, 981 (5th Cir. 1992).

Thus, in light of Congress' clear intent, the purpose and structure of the DOT Act limits judicial review for FAA employees to those explicitly provided for in the statute and accompanying procedures. Accordingly, since that is not the case here, the Court lacks jurisdiction to entertain plaintiffs' APA claims. Accordingly, in light of Congress' clear intent, the Court lacks jurisdiction to entertain plaintiffs' APA claims, and must GRANT defendants' motion to dismiss. An appropriate Order consistent with this ruling accompanies this Memorandum Opinion.

RICHARD J. LEON
United States District Judge

---

[13] Plaintiffs contend that the case law concerning the preclusive effect of the CSRA is inapplicable here because the employees in those cases had adequate procedural protections, which the plaintiffs lack here. (Pls. Opp'n to Mot. to Dismiss [Dkt. #27] 11-12.) Although plaintiffs assert that access to the MSPB and Office of Special Counsel was the "linchpin" in *Gray v. Office of Personnel Management*, 771 F.2d 1504 (D.C. Cir. 1985), and *Carducci v. Regan*, 714 F.2d 171 (D.C. Cir. 1983), the availability of other remedies was only one factor the Circuit Court considered. The Circuit Court also placed emphasis on not conferring greater rights to employees than provided for by Congress. *See Gray*, 771 F.2d at 1510-11; *cf. Carducci*, 714 F.2d at 175 (acknowledging that its ruling would render some limited number of minor personnel actions reviewable by neither the Office of Special Counsel nor the courts); *Graham*, 358 F.3d at 935 ("'[I]t is the comprehensiveness of the statutory scheme involved, not the "adequacy" of specific remedies thereunder, that counsels judicial abstention.'" (quoting *Spagnola v. Mathis*, 859 F.2d 223, 227 (D.C. Cir. 1988) (*en banc*)).). It bears noting, however, that plaintiffs do have some recourse through their facility manager, even if they deem that recourse unsatisfactory. *Cf. Stella v. Mineta*, 284 F.3d 135, 142-43 (D.C. Cir. 2002) (observing that prior to 2000 amendment to DOT Act granting FAA employees access to enforcement and investigation provisions for whistleblower actions, FAA employees' recourse for whistleblowing reprisals was solely within the FAA's PMS procedures).